IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

NEAL SIMS,                                    )
                                              )
                                              )        2:20-CV-01130-CCW
                    Plaintiff,                )
                                              )
        v.                                    )
                                              )
RICHARD CASTAGNA, DETECTIVE                   )
KRAH, AGENT BARACOCCI,                        )
MATTHEW DRUSKIN, and DAVID                    )
KLOBUCHER,                                    )
                                              )
                                              )
                    Defendants.               )
                                              )

## OPINION

        Before the Court are Motions for Summary Judgment filed by Defendants Penn Hills Police

Officer Matthew Druskin, Detective Shawn Krah, and Officer David Klobucher (the "Penn Hills

Defendants"), ECF No. 33, and Defendants Pennsylvania Bureau of Narcotics Agents Richard

Castagna and Wesley Baracocci[1] (the "BNI Defendants"), ECF No. 40.  For the following reasons,

both Motions will be GRANTED.

## I.      Background

### A.      Procedural History

        After Mr. Sims, proceeding pro se and in forma pauperis, filed his operative Second

Amended Complaint, Defendants filed Answers, and the case proceeded into discovery.  *See* ECF

No. 24 (Second Amended Complaint);  ECF No. 28 (Penn Hills Defendants' Answer);  ECF No.

30 (BNI Defendants' Answer).  Mr. Sims brings four claims pursuant 42 U.S.C. § 1983, all alleging

---

[1] The Court notes that although his name is spelled "Baracocci" in the case caption, his affidavit and the BNI Defendants' briefing (among other documents), spell his name "Biricocchi."  *See* ECF No. 41 (BNI Defendants' Brief) and ECF No. 43-1 (Affidavit of Wesley Biricocchi).  Because there is no dispute that these spellings refer to the same individual, and because neither party has moved to amend the case caption, the Court will continue to use "Baracocci."

violations of his rights under the Fourth Amendment of the United States Constitution: unreasonable seizure (Count I); unreasonable search (Count II); false arrest (Count III); and excessive force (Count IV). *See* ECF No. 24 at 3–5.

Following the close of discovery, the BNI Defendants and the Penn Hills Defendants moved for summary judgment on all counts. *See* ECF No. 33 (Penn Hills Defendants' Motion) and ECF No. 40 (BNI Defendants' Motion). In their Motion, the BNI Defendants sought, in part, to "join the legal arguments made [by the Penn Hills Defendants] to the extent applicable to the claims asserted against the BNI Defendants." ECF No. 40 ¶ 10. Because the BNI Defendants offered no facts or argument supporting a claim for qualified immunity (an argument expressly advanced by the Penn Hills Defendants), the Court directed the BNI Defendants to either notify the Court that they are not seeking qualified immunity, or, if they are seeking qualified immunity, to file a supplemental brief in support of that position. *See* ECF No. 59. The Court also provided an opportunity for Mr. Sims to file a response. *Id.* The BNI Defendants clarified that they indeed seek qualified immunity, and filed a brief in support. *See* ECF No 60. Mr. Sims did not file a response. Accordingly, the Defendants' Motions for Summary Judgment, ECF Nos. 33 and 40, are fully briefed and ripe for disposition.

### B. Material Facts

The parties disagree about many of the facts in this case. Mr. Sims, however, has not complied with the requirements of our Local Rules in responding to Defendants' statements of material fact. *See* L.Cv.R 56(C)(1)(a) (requiring party opposing summary judgment to "admit[] or deny[] whether each fact contained in the moving party's Concise Statement of Material Facts is undisputed and/or material"). The Penn Hills Defendants filed a Concise Statement of Undisputed Material Facts, *see* ECF No. 35, setting forth 51 consecutively numbered statements of fact, in compliance with L.Cv.R 56(B)(1). The BNI Defendants filed their own Concise

Statement of Undisputed Material Facts, in which they joined the Penn Hills Defendants' Concise Statement, and added two additional numbered fact statements of their own. *See* ECF No. 42. In his responsive Disputed Material Facts Against Penn Hills Police Defendants and Disputed Material Facts Against BNI Defendants, Mr. Sims only responded to facts that he disputes, *see* ECF Nos. 48 (response to BNI Defendants CSOF) and 51 (response to Penn Hills Defendants CSOF). As such, because "[c]ourts located in the Western District of Pennsylvania require strict compliance with the provisions of Local Rule 56," *Peay v. Co Sager*, No. 1:16-cv-130, 2022 U.S. Dist. LEXIS 18345 (W.D. Pa. Feb. 1, 2022) (Lanzillo, M.J.) *report and recommendation affirmed by*, 2022 U.S. Dist. LEXIS 33036 (W.D. Pa. Feb. 23, 2022), to the extent Mr. Sims did not respond to any particular statement of fact, or did not provide a contradictory statement of fact in his own fact statement, *see* ECF No. 52, that fact is deemed to have been admitted. *See Angle v. Carter*, No. 1:16-cv-00276 (Erie), 2019 U.S. Dist. LEXIS 17573, at *4 (W.D. Pa. Feb. 1, 2019) (Lanzillo, M.J.) (noting, in case with pro se plaintiff, "[a]ccording to the Local Rules of this Court, undisputed facts 'will for the purpose of deciding the motion for summary judgment be deemed admitted unless specifically denied or otherwise controverted by a separate concise statement of the opposing party.'") (quoting L.Cv.R. 56(E));  *see also Boyd v. Citizens Bank of Pa., Inc.,* Civil Action No. 2:12-cv-00332, 2014 U.S. Dist. LEXIS 70210, at *6–7 (W.D. Pa. May 22, 2014) (Fischer, J.) (recognizing that, while "courts accord pro se litigants a certain degree of leniency, particularly with respect to procedural rules," "[p]ro se litigants must adhere to procedural rules as would parties assisted by counsel…. This includes procedural requirements regarding the provision of adequate factual averments to sustain legal claims.") (citations omitted).

Unless noted otherwise, the undisputed, material facts, drawn from the parties' concise statements of material fact, responses thereto, and the evidence submitted in support of and opposition to the instant Motions,[2] are as follows:

### 1.    The Pursuit

On August 20, 2019, Det. Krah and NA Castagna were patrolling in an unmarked police vehicle and they observed Mr. Sims at a GetGo gas station in Penn Hills, Pennsylvania. *See* ECF No. 35 ¶ 1. Mr. Sims' car had dark tinted side windows, which appeared to Det. Krah and NA Castagna to be in violation of 75 Pa.C.S.A. § 4524(e). *See id.* ¶ 2. After Mr. Sims left the gas station,[3] Det. Krah and NA Castagna attempted to initiate a traffic stop by activating the lights and sirens on their vehicle. *See id.* ¶ 4. Mr. Sims did not immediately pull over; instead, he continued driving for more than half a mile until reaching his aunt's house on Hochburg Road, with Det. Krah and NA Castagna in pursuit. *See id.* ¶¶ 5, 10, 14; *see* ECF No. 51 ¶ 2 (disputing only that Defendants would have been able to observe Mr. Sims through the rear windshield of his vehicle); *see also* ECF No. 54 ¶¶ 8–9. Mr. Sims maintains that he drove at or below the speed limit and obeyed all traffic laws, *see* ECF No. 51 ¶ 1, ECF No. 52 ¶ 5; Defendants contend that Mr. Sims drove at a high rate of speed and committed multiple traffic violations during the pursuit (in addition to failing to stop when signaled by police). *See* ECF No. 35 ¶ 9. Although Mr. Sims was aware the vehicle pursuing him might have been the police, he was not sure, and so continued driving until he reached a place he believed was safe (i.e. his aunt's house on Hochburg Road).

---

[2] *See* ECF No. 35 (Penn Hills Defendants' Concise Statement of Undisputed Material Facts); ECF No. 36 (Appendix to ECF No. 35); ECF No. 42 (BNI Defendants' Concise Statement); ECF No. 43 (Appendix to ECF No. 42); ECF Nos. 48 (Disputed Material Facts Against BNI Defendants) and 51 (Disputed Material Facts Against Penn Hills Police Defendants); ECF No. 52 (Mr. Sims' Proposed Undisputed Material Facts and exhibits); ECF No. 54 (Defendants' Joint Response to ECF No. 52); and ECF No. 55 (Appendix to ECF No. 54).

[3] Mr. Sims, both in his deposition and in his summary judgment filings, makes much of the undisputed fact that his side windows were rolled down when he left the gas station and when Det. Krah and NA Castagna initiated the traffic stop. For reasons discussed below, this fact is immaterial to the resolution of Defendants' Motions.

*See id.* ¶¶ 6–8;  ECF No. 36-1 at 42:18-21 (Mr. Sims conceding that he "knew it was a possibility it could be the police") and 43:3-5 (testifying "I went in the direction that I was going to my aunt's house, the closest destination that I knew I was safe.").

In their reports of the incident, Det. Krah and NA Castagna claim that they observed, through the tinted rear windshield, Mr. Sims reaching towards the passenger seat of his car, leading them to believe Mr. Sims may have been attempting to grab or conceal a firearm.  *See* ECF No. 35 ¶¶ 10–11.  Mr. Sims disputes that they would have been able to observe his movements through the dark tinting of the rear windshield on his car, although he does not dispute that he reached towards the passenger side of the car.  *See* ECF No. 51 ¶ 2–3, ECF No. 52 ¶¶ 3–4.

### 2.      The Physical Encounter

After arriving at his aunt's house, Mr. Sims parked his car on the side of Hochburg Road. *See* ECF No. 35 ¶ 14.  Det. Krah and NA Castagna stopped behind Mr. Sims.  *See* ECF No. 36-1 at 84:18–20 (Q:  "Their vehicle, was it in front of your vehicle or behind your vehicle?"  A: "Behind my vehicle.").  According to Mr. Sims, after rolling up the windows, he got out of his car and either walked towards Det. Krah and NA Castagna or stood still, in either case with his hands raised while asking something to the effect of, "What's wrong?  What's going on here?"  ECF No. 36-1 at 23:13–21, 32:8–12, 84:8–85:10.  Mr. Sims testified that, although he saw that Det. Krah and NA Castagna were wearing tactical vests with the word "POLICE" on the chest, he was still unsure that they were police officers because they were operating an unmarked car and did not display any badges.  *See id.* at 32:13–19 ("I seen no badges.  I seen no chain badges, no nothing. It was just people with guns that said 'Police' on them.  Nothing else.");  *see also* ECF No. 35 ¶ 16.

5

Det. Krah and NA Castagna, who at this point had drawn their firearms, ordered Mr. Sims to get on the ground. *See* ECF No. 35 ¶ 17; *see* ECF No. 36-1 at 23:15–18, 85:3–4. Mr. Sims concedes that he did not comply with this command, but instead continued to move. *See* ECF No. 35 ¶¶ 18–19; *see also* ECF No. 36-1 at 85:5–15. Defendants maintain, and Mr. Sims does not dispute, that Mr. Sims appeared to Det. Krah and NA Castagna to be "possibly attempting to take a position of cover and possibly attempting to grab a weapon." ECF No. 35 ¶ 20. According to Mr. Sims, NA Castagna then holstered his sidearm and tackled Mr. Sims through a line of bushes and down a short slope onto the yard of Mr. Sims' aunt's house. *See* ECF No. 36-1 at 24:12–17. At some point before he was tackled, Mr. Sims threw his car keys onto the porch of his aunt's house. *See* ECF No. 35 ¶ 15; *see* ECF No. 36-1 at 25:3–5.

The parties disagree about what happened next, including: who struck whom, whether Mr. Sims struck anyone at all, and whether Mr. Sims resisted the efforts of Defendants to restrain him. *Compare, e.g.,* ECF No. 35 ¶¶ 21–26 *with* ECF No. 51 ¶¶ 5–11. Defendants contend that Mr. Sims resisted arrest, that in the course of the struggle Mr. Sims scratched Det. Krah and NA Castagna and kicked Defendant NA Castagna in the groin, and that "NA Krah and Det. Castagna attempted to gain control with several strikes, but were not successful, as Mr. Sims continued to scratch, grab, shove and toss his arms to break free of control." *See* ECF No. 35 ¶¶ 21–27. Mr. Sims claims that he did not resist, nor did he strike any of the Defendants; indeed, Mr. Sims maintains that any blow to NA Castagna's groin was accidental. *See* ECF No. 51 ¶¶ 5–11; *see also* ECF No. 36-1 at 41:1–3 ("I did not intentionally kick that man in his groin. My legs went into his groin when he tackled me down the hill."). As to the Defendants' actions, Mr. Sims testified that:

> So Krah and Castagna are working me over in the yard. There is a third officer from the Attorney General's office [i.e. NA Baracocci] that runs down the hill and coldcocks me in my eye. Like I'm talking about it's the cleanest -- it's the cleanest punch I've ever seen, felt, anything in my life. He grabbed me by the back of my

head and punched me clean in my face, and then I was dragged down the hill and then beat on some more.

ECF No. 36-1 at 45:1–9.

Shortly thereafter Officer Druskin and Klobucher arrived on the scene, and Defendants were able to handcuff Mr. Sims. *See* ECF No. 35 ¶¶ 29–30; ECF No. 36-7 (Druskin and Klobucher bodycam footage of arrest). Mr. Sims requested medical attention, and, after being evaluated at the scene, was transported to Forbes Hospital for treatment. *See id.* ¶ 34; ECF No. 36-1 at 48:19–49:1. Mr. Sims claims that as a result of the incident he sustained various injuries, including cuts and bruises to his face, a ruptured eardrum, wrist pains, and severe headaches. *See* ECF No. 36-1 at 49:11–20; *see also* ECF No. 52 ¶ 17. Mr. Sims testified that, aside from a obtaining a "second opinion" related to his injuries, he did not obtain any additional medical treatment. *See* ECF No. 36-1 at 49:21–50:14.

### 3.    The Video Evidence

As described in more detail below, there is some video evidence of the August 20, 2019 physical encounter which ended in Mr. Sims' arrest, consisting of (1) body and dashcam footage from Officer Druskin, *see* ECF No. 36-7; (2) bodycam footage from Officer Klobucher, *see id.*; and (3) a cellphone video taken by a bystander. *See* ECF No. 36-9 ("Neal.MP4") and ECF No. 52, Ex. J ("Copy of Neal") (collectively, the "bystander video").[4] The video evidence, however, captures only portions of the incident. The Druskin and Klobucher bodycam videos, for example, only record the end of the encounter, when Officers Druskin and Klobucher arrived on the scene to assist with handcuffing Mr. Sims. *See* ECF No. 36-7. The remainder of the bodycam footage, along with the dashcam footage, records Officers Druskin and Klobucher driving to the scene and

---

[4] These videos, which are copies of the same video, appear to be the only bystander recordings of the arrest. *See* ECF No. 36-1 at 55:16–21.

post-arrest events—i.e. Mr. Sims' interactions with the officers on the scene as he sat handcuffed in the back of Officer Druskin's vehicle. *See id.* The bystander video likewise captures only a fragment of the incident. *See* ECF No. 36-9. It was recorded from the front porch of the house next to Mr. Sims' aunt's home. *See id.* Besides the bystander not being in close proximity to the altercation, the camera's view is partially obstructed by bushes, trashcans, patio furniture, and the columns supporting the roof over the porch on Mr. Sims' aunt's house. *See id.* More significantly, the bystander video records only a few seconds of the physical struggle itself. *See id.*

**4.     The Arrest, Search, and Criminal Charges**

After placing Mr. Sims under arrest, pursuant to department policy and because the officers on the scene determined that Mr. Sims' car was blocking the roadway, Det. Krah performed an inventory search of the passenger area of Mr. Sims' car before having the car towed. *See* ECF No. 35 ¶¶ 35–37 (citing ECF No. 36-11). Mr. Sims disputes that his car was blocking the roadway, that the search was limited to the passenger area of the car, and contends that other officers assisted Det. Krah with the search. *See* ECF No. 51 ¶¶ 16–17. The inventory search resulted in the seizure of a quantity of marijuana and related paraphernalia, including a digital scale. *See* ECF No. 35 ¶ 38; *see also* ECF No. 51 ¶ 18 (disputing only that the search was limited to the passenger area of the vehicle). Mr. Sims was charged in state court with a variety of offenses, including possession with intent to distribute, various traffic offenses, aggravated assault, and resisting arrest. *See* ECF No. 35 ¶ 40. A preliminary hearing on the charges against Mr. Sims was held before Magisterial District Judge Deluca on September 16, 2019. *See id.* ¶ 41. MDJ Deluca determined that a prima facie case existed and bound the charges over to court. *See id.* ¶ 45. The Allegheny County District Attorney ultimately decided, however, not to pursue the case, and the charges against Mr. Sims were withdrawn. *See id.* ¶ 46. At some point, the Assistant District Attorney responsible for the

case said that continuing to pursue the charges against Mr. Sims would be "unethical." *See* ECF No. 52 ¶ 24;  ECF No. 52-4;  *but see* ECF No. 54 ¶ 24 (contending that the District Attorney's decision to withdraw the charges is immaterial here).

## II.   Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Mann v. Palmerton Area Sch. Dist.*, 872 F.3d 165, 170 (3d Cir. 2017) (internal citations and quotations omitted).  "A factual dispute is 'genuine' if the 'evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Razak v. Uber Techs., Inc.,* 951 F.3d 137, 144 (3d Cir. 2020) (quoting *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986)). "A factual dispute is 'material' if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson*, 477 U.S. at 248).

The burden to establish that there is no genuine dispute as to any material fact "remains with 'the moving party regardless of which party would have the burden of persuasion at trial.'" *Aman v. Cort Furniture Rental Corp*., 85 F.3d 1074, 1080 (3d Cir. 1996) (quoting *Chipollini v. Spencer Gifts, Inc.*, 814 F.2d 893, 896 (3d Cir. 1987)).  That said, "[i]f the non-moving party bears the burden of persuasion at trial, 'the moving party may meet its burden on summary judgment by showing that the nonmoving party's evidence is insufficient to carry that burden.'" *Kaucher v. County of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (quoting *Wetzel v. Tucker*, 139 F.3d 380, 383 n.2 (3d Cir. 1998)).

Once the moving party has carried its initial burden, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts…. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Industrial Co. v. Zenith Radio Corp*., 475 U.S. 574, 586–87 (1986).  Thus, while "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor," *Anderson*, 477 U.S. at 255, summary judgment "requires the nonmoving party to go beyond the pleadings" and point to "'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (citation omitted).  But, while the court must "view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor…to prevail on a motion for summary judgment, the non-moving party must present more than a mere scintilla of evidence; there must be evidence on which the jury could reasonably find for the [non-movant]." *Burton v. Teleflex Inc*., 707 F.3d 417, 425 (3d Cir. 2013) (internal citations and quotations omitted).  If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to [the non-movant's] case, and on which [the non-movant] will bear the burden of proof at trial," Rule 56 requires the entry of summary judgment because such a failure "necessarily renders all other facts immaterial."  *Celotex*, 477 U.S. at 322–23;  *Jakimas v. Hoffman La Roche, Inc*., 485 F.3d 770, 777 (3d Cir. 2007).

## III.   Analysis

Both sets of Defendants move for summary judgment in full.  Mr. Sims' claims are all brought pursuant to 42 U.S.C. § 1983.  "To state a claim for relief under § 1983, 'a plaintiff must demonstrate the defendant, acting under color of state law, deprived him or her of a right secured by the Constitution or the laws of the United States.'"  *Cost v. Borough of Dickson City*, 858 F. App'x 514, 517 (3d Cir. 2021) (quoting *Kaucher v. Cnty. of Bucks*, 455 F.3d 418, 423 (3d Cir.

2006)).  The Court will address Mr. Sims' claims for unreasonable seizure (Count I) and false arrest (Count III) together, before turning to address his claims for unreasonable search (Count II) and excessive use of force (Count IV).

>    **A.    Defendants Are Entitled to Summary Judgment on Mr. Sims' Claims for Unreasonable Seizure (Count I) and False Arrest (Count III)**

The Fourth Amendment secures an individual's right to be free from unreasonable searches and seizures.  *See* U.S. Const. amend. IV.  "Generally, for a seizure to be reasonable under the Fourth Amendment, it must be effectuated with a warrant based on probable cause." *United States v. Lewis*, 672 F.3d 232, 237 (3d Cir. 2012) (quoting *United States v. Robertson*, 305 F.3d 164, 167 (3d Cir. 2002)).  "It is well-settled that a traffic stop is a 'seizure' under the Fourth Amendment." *Barnett v. City of Phila.*, 498 F. Supp. 3d 700, 706 (E.D. Pa. 2020) (citing *United States v. Johnson*, 452 F. App'x 219, 225 (3d Cir. 2011)).

That said, "[a] well-established exception to the Fourth Amendment's warrant requirement permits an officer to 'conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot.'" *Lewis*, 672 F.3d at 237 (3d Cir. 2012) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)).  And "[t]he requirement of reasonable suspicion for a *Terry* stop-and-frisk applies with equal force to a traffic stop of a vehicle." *Id.* (*citing United States v. Delfin-Colina*, 464 F.3d 392, 397 (3d Cir. 2006)).  Thus, "[a]s the Third Circuit has explained, the Supreme Court established a 'bright-line rule that any technical violation of a traffic code legitimizes a stop, even if the stop is merely pretext for an investigation of some other crime.'" *Id.* at 707 (quoting *United States v. Mosley*, 454 F.3d 249, 252 (3d Cir. 2006)).

A warrantless arrest, on the other hand, must be supported by probable cause to pass constitutional muster.  *See, e.g.*, *District of Columbia v. Wesby*, 138 S. Ct. 577, 585–86 (2018) ("Because arrests are 'seizures' of 'persons,' they must be reasonable under the circumstances…A

warrantless arrest is reasonable if the officer has probable cause to believe that the suspect committed a crime in the officer's presence.") (citations omitted)).  And, an arrest is supported by probable cause "if 'at the moment the arrest was made . . . the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that [the suspect] had committed or was committing an offense.'"  *Wright v. City of Phila.*, 409 F.3d 595, 602 (3d Cir. 2005) (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)).  "Probable cause 'is not a high bar,'"  *Wesby*, 138 S.Ct. at 586 (quoting *Kaley v. United States*, 571 U.S. 320, 338 (2014)), instead requiring only "a belief of guilt that is reasonable, as opposed to certain."  *Wright*, 409 F.3d at 602.  Thus, "[w]hile 'mere suspicion' is insufficient to create probable cause, 'an officer is not required to have evidence to prove guilt beyond a reasonable doubt.'"  *Barnett*, 498 F. Supp. 3d at 709 (quoting *Eckman v. Lancaster City*, 529 F. App'x 185, 186 (3d Cir. 2013)).  Finally, "[a]lthough the existence of probable cause for arrest is generally a question of fact for the jury, 'a district court may conclude "that probable cause exists as a matter of law if the evidence, viewed most favorably to the Plaintiff, reasonably would not support a contrary factual finding."'"  *Id.* at 709 (quoting *Eckman*, 529 F. App'x at 186).

Here, the Court's analysis of Mr. Sims' claims in Counts I and III begins with determining the point at which Mr. Sims was "seized" within the meaning of the Fourth Amendment.  The Supreme Court has held that a seizure does not occur "'until there is a governmental termination of freedom of movement *through means intentionally applied*.'"  *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 844 (1998) (emphasis original) (quoting *Brower v. County of Inyo*, 489 U.S. 593, 596-597 (1989)).  Accordingly, here, no seizure within the meaning of the Fourth Amendment occurred until *after* the vehicle pursuit had ended.  *See id.*  ("No Fourth Amendment seizure would take place where a 'pursuing police car sought to stop the suspect only by the show of authority

represented by flashing lights and continuing pursuit.'") (quoting *Brower*, 489 U.S. at 597).  And, at that point, the undisputed facts here are clear that Det. Krah and NA Castagna, later joined by NA Baracocci and Officers Druskin and Klobucher, had probable cause to detain Mr. Sims.

Mr. Sims concedes that the side windows on his vehicle were tinted in violation of the Pennsylvania Vehicle Code, 75 Pa. C. S. A. §4524(e).  *See* ECF No. 35 ¶ 2;  ECF No. 36-1 at 18:3–12.  Mr. Sims does not dispute that, when Det. Krah and NA Castagna entered the gas station parking lot, the side windows of his car were rolled up, leaving their dark tinting visible.  *See* ECF No. 36-2 at 6:1–5 ("We were at the GetGo on Frankstown Road, we pulled into the GetGo and we observed a silver Lexus…that had very heavily tinted windows.");  *see also* ECF No. 54 ¶ 1;  ECF No. 47 at 1 (noting that Det. Krah and NA Castagna "had already been observing Plaintiff at the GetGo gas station as he was pumping gas…If there was an issue about Plaintiff [sic] front side windows being tinted the [D]efendants could have approached him at the gas station and said something to him about it.").  Next, Mr. Sims also concedes that, once Det. Krah and NA Castagna had activated the lights and sirens on their vehicle to initiate the stop, he did not pull over, but instead continued driving until he reached his aunt's house.  *See* ECF No. 35 ¶¶ 5, 14;  ECF No. 36-1 at 30:3–14.  Defendants contend that by failing to stop, "Mr. Sims committed the offense of fleeing or attempting to elude police officers."  ECF No. 34 at 5 (citing 75 Pa.C.S.A. § 3733A). The Defendants thus posit that Det. Krah and NA Castagna had (1) reasonable suspicion sufficient to initiate a traffic stop and (2) probable cause to arrest Mr. Sims, based, at a minimum, on his failure to promptly stop his vehicle.[5]  *See* ECF No. 34 at 5–6;  ECF No. 41 at 6–8.

---

[5] Defendants also argue that under their version of subsequent events additional probable cause developed —e.g. Defendants contend Mr. Sims resisted arrest and fought with Det. Krah and NA Castagna, giving rise to probable cause that Mr. Sims committed offenses related to those acts.  *See, e.g.,* ECF No. 34 at 6.  However, many of those facts are disputed, so, for the purposes of the analysis here, the Court will focus only on the undisputed facts related to the pursuit.

Mr. Sims attempts to argue that because the windows of his car were rolled down when Det. Krah and NA Castagna first attempted to stop him, they lacked any lawful basis to initiate the traffic stop. *See* ECF No. 47 at 1 ("However, Plaintiff's front side windows were rolled completely down when he exited the gas station so how was it the front tinted windows were the cause of the defendants pulling the Plaintiff over…Defendants had no probable cause to stop Plaintiff."). Mr. Sims further argues that, because Det. Krah and NA Castagna were operating an unmarked vehicle, he was unsure that they were police and he was therefore justified in driving to a place he believed to be safe before stopping. *See* ECF No. 47 at 1 ("Plaintiff did not know for sure who was in the unmarked vehicle that began to follow him…Plaintiff had a right to feel safe, and the unmarked vehicle that the [D]efendants were in was untagged."); ECF No. 50 at 1 (same).

These arguments fail, however. Even if Det. Krah and NA Castagna were not able to observe the window tint before initiating the traffic stop, and in that case would have initially lacked reasonable suspicion, once they activated the lights and sirens on their vehicle and Mr. Sims failed to pull over and instead led the officers on a more than half-mile pursuit, the officers had, at a minimum reasonable suspicion to stop Mr. Sims, and, indeed probable cause to arrest him. At that point, the facts available to Det. Krah and NA Castagna "'were sufficient to warrant a prudent man in believing that [the suspect] had committed or was committing an offense.'" *Wright*, 409 F.3d at 602. Specifically, Det. Krah and NA Castagna had probable cause to believe that Mr. Sims was committing the offense of fleeing or attempting to elude police officers in violation of 75 Pa.C.S.A. § 3733(a).

Indeed, although Mr. Sims may have been able to avail himself of an affirmative defense to a charge of fleeing in a subsequent criminal prosecution, *see* 75 Pa.C.S.A. § 3733(c)(1)–(2), and the possible existence of such a defense may be relevant to the probable cause analysis, *see Holman*

14

*v. City of York,* 564 F.3d 225, 230 (3d Cir. 2009), the Court concludes, based on the evidence in the record—particularly, that the pursuit occurred in daylight, through residential areas, lasted for more than half a mile, and the undisputed fact that Det. Krah and NA Castagna signaled Mr. Sims to stop with lights and sirens—that the facts available to Det. Krah and NA Castagna were sufficient to establish probable cause to arrest Mr. Sims. [6] *See, e.g.*, *Reiff v. Marks,* No. 08-CV-5963, 2011 U.S. Dist. LEXIS 18205, at *28 (E.D. Pa. Feb. 23, 2011) ("In Pennsylvania, an individual may be arrested without a warrant when he or she commits a misdemeanor in the presence of a police officer.  An individual has committed a second-degree misdemeanor if he willfully fails or refuses to bring his vehicle to a stop, or who otherwise flees or attempts to elude a pursuing police vehicle, when given a visual and audible signal to bring the vehicle to a stop.'") (citing *United States v. Ryan*, 128 F. Supp. 2d 232, 236 (E.D. Pa. 2000) and quoting 75 Pa. Cons. Stat. § 3733(a)).

---

[6] And, to be sure, the undisputed facts of this case differ in significant respects from those of, for example, *Mazuka v. Rice Twp. Police Dep't*, 655 F. App'x 892 (3d Cir. 2016), in which the Third Circuit affirmed a district court's denial of qualified immunity at summary judgment on the ground that there was a genuine dispute of fact as to whether plaintiff was able "to safely pull over after [defendant] first activated his lights," which is an affirmative defense under § 3733(c)(2). *Id.* at 895.  The events in *Mazuka* took place in the early morning hours, well before sunrise. *See id.*; *see also Mazuka v. Rice Twp. Police Dep't*, No. 3:13-CV-02003, 2014 U.S. Dist. LEXIS 196783, at *7 (M.D. Pa. Nov. 28, 2014) (statement of facts noting events transpired around 1:00 a.m.).  And, plaintiff in *Mazuka* (1) turned on his hazard lights, (2) turned on his interior dome light, (3) made no turns, (4) ultimately stopped in a parking lot, and (5) "submitted photographs of the roadway" in support of his claim, all of which the district court and the Third Circuit agreed were facts that created a jury question as to "whether a reasonable officer could have had probable cause to believe [plaintiff] was fleeing or attempting to elude [defendant], as opposed to simply looking for a place to safely pull over." *Mazuka*, 655 F. App'x at 895.  Here, it is undisputed that the pursuit took place through residential areas during daylight hours, that Mr. Sims did not activate his hazard lights or otherwise signal he was not attempting to evade the police, that Det. Krah and NA Castagna observed Mr. Sims reaching around in his car during the pursuit, and that Mr. Sims ultimately parked his car on a residential street. *See* ECF No. 35 ¶¶ 1–11, 14.  Nor has Mr. Sims presented any evidence regarding the nature of the roadway on the route he drove from the gas station to his aunt's house to support the contention that there was no safe place for him to stop.  As such, Mr. Sims' bare testimony that, "[t]here is no public place in between that, in between that place. A lot of places in between are dilapidated within the strip of that vicinity, and I went to *the safest place that I knew* that I would have justified safeness," ECF No. 36-1 at 30:10–14 (emphasis added), is insufficient to create a genuine question of fact as to "whether a reasonable officer could have had probable cause to believe [Mr. Sims] was fleeing or attempting to elude [Defendants], as opposed to simply looking for a place to safely pull over." *Mazuka*, 655 F. App'x at 895.

Finally, the remaining Defendants—NA Baracocci, Officer Klobucher, and Officer Druskin—who arrived on the scene after the vehicle pursuit had ended, were entitled to rely on the information known to Det. Krah and NA Castagna when assisting with the arrest. *See United States v. Burton,* 288 F.3d 91, 99 (3d Cir. 2002) ("'An officer can lawfully act solely on the basis of statements issued by fellow officers if the officers issuing the statements possessed the facts and circumstances necessary to support a finding of the requisite basis.'") (quoting *Rogers v. Powell*, 120 F.3d 446, 453 (3d Cir. 1997)).

Thus, the Court concludes that there is no genuine dispute that Det. Krah and NA Castagna possessed the probable cause necessary to arrest Mr. Sims and, therefore, Defendants are entitled to summary judgment on Mr. Sims' claims at Counts I and III for unreasonable seizure and false arrest. That said, however, the question of whether the arrest itself was lawful is distinct from the question of whether the force used by the officers in effectuating that arrest was excessive. That issue is addressed below.

### B. Defendants Are Entitled to Summary Judgment on Mr. Sims' Claim for Unreasonable Search of Person and Vehicle (Count II) Will Be Dismissed

In Count II of the Second Amended Complaint, Mr. Sims claims that "Defendants did not have any legal justification to search Plaintiffs' [sic] vehicle," and that "[s]earching Plaintiff and vehicle without probable cause or any other legal justification violated his Fourth Amendment right…to be free from unreasonable searches." ECF No. 24 at 4. Defendants argue that Mr. Sims' claim for unreasonable search must be dismissed because (1) the search of Mr. Sims' vehicle was a lawful inventory search, *see* ECF No. 34 at 11–12 (citing *Colorado v. Bertine,* 479 U.S. 367 (1987)) and (2) the search turned up contraband. *See* ECF No. 41 at 12 (citing *Moore v. Monaghan*, No. 19-4400, 2021 U.S. Dist. LEXIS 849, at *16 (E.D. Pa. Jan. 5, 2021)). Mr. Sims disputes that

his car was left parked in a way that obstructed traffic on Hochburg Road, and that the search was limited to the passenger area of the vehicle.  *See* ECF No. 51 ¶¶ 16, 18.

As an initial matter, Mr. Sims has not pointed to any facts related to a search of his person, and, in any event, there is no evidence that any such search would have exceeded the bounds of a lawful search incident to arrest.  *See Arizona v. Gant,* 556 U.S. 332, 339 (2009) ("a search incident to arrest may only include 'the arrestee's person and the area "within his immediate control"—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence.'") (quoting *Chimel v. California*, 395 U.S. 752, 763 (1969)).  Therefore, the only other search at issue is the search of Mr. Sims' car.

On that claim, Defendants maintain that the BNI Defendants and Officers Druskin and Klobucher did not participate in the search of Mr. Sims' car, and that the search of his vehicle was limited to the passenger compartment.  *See* ECF No. 35 ¶¶ 37–38 (inventory search performed by Det. Krah), ECF No. 36-11 (declaration of Det. Krah), and ECF No. 43-1 (affidavits of NAs Castagna and Baracocci).  Mr. Sims does not meaningfully dispute that Defendants Castagna, Baracocci, Klobucher, and Druskin did not participate in the search or that the search was limited to the passenger area, *see* ECF No. 51 ¶¶ 17–18 and ECF No. 52 ¶ 19, and instead points to the bystander video which shows one officer opening the passenger side door and performing a search of that area of the car, and appears to show another officer doing the same on the driver's side. *See* ECF No. 36-9.  Neither officer is clearly identifiable from the bystander video and, importantly, it appears that by the time the inventory search was performed numerous other police officers (i.e., in addition to the five named Defendants) had arrived on the scene.[7]  *See id.*  Because

---

[7] The Court also notes that in the bodycam videos, more than one officer can be seen conducting the inventory search of Mr. Sims' car.  *See* ECF No. 36-7.  However, as with the bystander video, it is not possible to discern the identity of the officers conducting the search (although it is clear that NA Castagna, still apparently suffering from the blow

"a plaintiff must demonstrate a defendant's 'personal involvement in the alleged wrongs'" *Chavarriaga v. N.J. Dep't of Corr.*, 806 F.3d 210 (3d Cir. 2015) (quoting *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988), and because Mr. Sims has not pointed to any evidence demonstrating the personal involvement of the BNI Defendants or Officers Druskin or Klobucher, those Defendants are entitled to summary judgment on Count II.

Next, the undisputed evidence demonstrates that the search of Mr. Sims' vehicle was a lawful inventory search.  "One…exception [to the warrant requirement] is an inventory search conducted for purposes other than an investigation." *Jackson v. City of Pittsburgh*, 688 F. Supp. 2d 379, 390 (W.D. Pa. 2010) (Fischer, J.) (citing *Holeman v. City of New London*, 425 F.3d 184, 191 (2d Cir. 2005)).  Such a search must adhere to standardized procedures, and the search must be limited to the purpose of cataloging and safeguarding the vehicle's contents.  *Id.* (citations omitted;  *see also United States v. Mundy*, 621 F.3d 283, 287 (3d Cir. 2010) ("Inventory procedures serve three 'strong governmental interests': '[1] to protect an owner's property while it is in the custody of the police, [2] to insure against claims of lost, stolen, or vandalized property, and [3] to guard the police from danger.'") (citations omitted).  Furthermore, "[t]he government's power to remove vehicles from public thoroughfares is 'beyond challenge.'"  *Jackson*, 688 F.Supp.2d at 390 (quoting *South Dakota v. Opperman*, 428 U.S. 364, 369 (1976)).  Finally, "[t]he Court of Appeals for the Third Circuit has held that a decision to impound a vehicle, even when contrary to a standard procedure, is not a *per se* violation of the Fourth Amendment, and removing vehicles that impede traffic is reasonable."  *Id.* (citing *United States v. Smith*, 522 F.3d 305, 312–13 (3d Cir. 2008)).

---

to his groin, did not participate).  Indeed, by the time the inventory search is being conducted, it appears that multiple uniformed and non-uniformed officers in addition to the named defendants had arrived on the scene.  *See id.*  Mr. Sims does not point to any evidence, or provide any method, of sorting out the named Defendants from the other officers, and the Court is unable to do so itself based on the available evidence.

Here, Mr. Sims contends that his car was parked in a way that did not impede traffic, but he offers no evidence to support this point and, furthermore, concedes that his car was left in the roadway.  *See* ECF No. 51 ¶ 16;  ECF No. 52 ¶ 20.  And, Mr. Sims testified that "if there is cars parked on the street [i.e. Hochburg Road], you have to drive on the left side of the street to go down the street, but you can't – there is no way for two cars to come down the street at the same time."  ECF No. 36-1 at 89:16–20.  Det. Krah, therefore had sufficient justification to have Mr. Sims' car towed and, pursuant to that process, conduct an inventory search of it.  *See* ECF No. 36-11 ¶ 4 (declaration of Det. Krah noting that "the vehicle was interfering with the flow of traffic on the roadway, the vehicle was arranged to be towed.").  Next, Det. Krah's declaration states that he performed the inventory search in accordance with department policy, and limited his search to the passenger area.  *See* ECF No. 36-11 at ¶¶ 5–6.  As noted above, Mr. Sims has not pointed to any evidence that creates a genuine dispute of material fact on either of these points.  Accordingly, the Court concludes that the search of Mr. Sims' car was a lawful inventory search, and so summary judgment will be granted on Count II.

Even if there was a genuine dispute as to whether Det. Krah conducted a lawful inventory search of Mr. Sims' vehicle, Mr. Sims' claim at Count II could not survive.  "Although a plaintiff whose privacy is invaded may recover damages in a § 1983 action for an unlawful search or seizure, that same plaintiff is not entitled to damages when the search yields incriminating evidence."  *Moore,* 2021 U.S. Dist. LEXIS 849, at *16 (E.D. Pa. Jan. 5, 2021) (citing *Hector v. Watt*, 235 F.3d 154, 157 (3d Cir. 2000) ("'Victims of unreasonable searches or seizures may recover damages directly related to the invasion of their privacy—including (where appropriate) damages for physical injury, property damage, injury to reputation, etc.;  but such victims cannot be compensated for injuries that result from the discovery of incriminating evidence and

consequent criminal prosecution.'") (quoting *Townes v. City of N.Y.*, 176 F.3d 138, 148 (2d Cir. 1999)).  Mr. Sims does not meaningfully dispute—and indeed appears to admit, *see* ECF No. 36-1 at 39:19–40:2—that the search of his car resulted in the recovery of contraband, namely, "marijuana, a digital scale with marijuana residue and three empty THC edible containers."  ECF No. 35 ¶ 38;  ECF No. 51 ¶ 18 (disputing only that the search was limited to "Plaintiff's area of the car.").

Therefore, for the reasons set out above, Defendants are entitled to summary judgment on Count II.

## C.   Defendants Are Entitled to Summary Judgment on Mr. Sims' Claim for Excessive Force (Count IV)

In Count IV of the Second Amended Complaint, Mr. Sims alleges that Defendants used excessive force in arresting him—in short, Mr. Sims claims that he attempted to cooperate, but Defendants violently assaulted him—resulting in Mr. Sims suffering various injuries.  *See* ECF No. 24 ¶¶ 10–23, and at 5.  As to Count IV, Defendants argue that (1) the force used against Mr. Sims was objectively reasonable, and therefore no Fourth Amendment violation occurred and (2) that, even if there is a genuine dispute of fact as to the reasonableness of the force used, they are entitled to qualified immunity.  *See* ECF No. 34 at 8–12;  ECF No. 41 at 12–17;  ECF No. 53 at 4–5;  ECF No. 60 at 1–6.

In resolving a claim of qualified immunity, courts analyze "(1) whether the facts alleged by the plaintiff show the violation of a constitutional right;  and (2) whether the right was clearly established at the time of the alleged misconduct."  *James v. City of Wilkes-Barre*, 700 F.3d 675, 679 (3d. Cir. 2012) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).  Further, "district courts are 'permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at

hand.'" *Bayer v. Monroe Cnty. Children & Youth Servs.*, 577 F.3d 186, 191–92 (3d Cir. 2009) (quoting *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).  Here, the Court will first address the reasonableness of the use of force.

### 1.      Reasonableness of the Use of Force

#### a.      Legal Standard

In evaluating an excessive force claim, the Court determines "whether a constitutional violation has occurred using the Fourth Amendment's objective reasonableness test." *Santini v. Fuentes*, 795 F.3d 410, 417 (3d Cir. 2015) (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989)). In conducting this assessment, "'[t]he "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Cty. of L.A. v. Mendez*, 137 S. Ct. 1539, 1546–47 (2017) (quoting *Graham*, 490 U.S. at 396));  *see also Saucier v. Katz*, 533 U. S. 194, 207 (2001) ("Excessive force claims . . . are evaluated for objective reasonableness based upon the information the officers had when the conduct occurred.").  Where, as here, there is video of the events, the court should "view[] the facts in the light depicted by the videotape." *Scott v. Harris*, 550 U.S. 372, 381 (2007).  That is, at summary judgment the Court must normally adopt "'the plaintiff's versions of the facts'…unless 'no reasonable jury could believe it;" as such, in cases with reliable video evidence, "courts must not adopt a version of the facts that is 'blatantly contradicted' by the video footage." *Jacobs v. Cumberland Cty.*, 8 F.4th 187, 192 (3d Cir. 2021) (quoting *Scott*, 55 U.S. at 378, 380).

The Fourth Amendment excessive force "inquiry is highly individualized and fact specific." *Santini*, 795 F.3d at 417.  There are several factors that the Third Circuit has said district courts may consider when evaluating the reasonableness of a particular use of force, including:

> (1) the severity of the crime at issue, (2) whether the suspect poses an imminent threat to the safety of the police or others in the vicinity, and (3) whether the suspect

attempts to resist arrest or flee the scene [and] [4] the possibility that the persons
subject to the police action are themselves violent or dangerous, [5] the duration of
the action, [6] whether the action takes place in the context of effecting an arrest,
[7] the possibility that the suspect may be armed, and [8] the number of persons
with whom the police officers must contend at one time.

*Id.* (citing *Graham*, 490 U.S. at 396 (factors (1) through (3)) and quoting *Sharrar v. Felsing*, 128

F.3d 810, 822 (3d Cir. 1997) (factors [4] through [8]) (numbering added)).  Finally, this "inquiry

is dispositive:  When an officer carries out a seizure that is reasonable, taking into account all

relevant circumstances, there is no valid excessive force claim."  *Mendez*, 137 S.Ct. at 1547.

### b. Use of Force by Officers Druskin and Klobucher

Here, the video evidence is dispositive of the claims against Officers Klobucher and

Druskin, who were wearing body cameras at the time of the arrest.  The bodycam videos

conclusively show that when Officers Klobucher and Druskin arrived on the scene, the other

Defendants had already pinned Mr. Sims to the ground.  *See* ECF No. 36-7.  The bodycam videos

show Officers Klobucher and Druskin assisting the other Defendants by applying pressure to

restrain Mr. Sims and gaining control of Mr. Sims' arms to place him in handcuffs.  *See id.*  These

videos further confirm that once Mr. Sims had been handcuffed, all Defendants stop applying force

and move away from Mr. Sims.  *See id.*  And, finally, only about one minute elapses from when

Officers Druskin and Klobucher arrive to when Mr. Sims is handcuffed and Defendants cease

applying force.  *See id.*  As such, based on this video evidence, although when Officers Druskin

and Klobucher arrived Mr. Sims was already pinned to the ground by multiple officers (and was

therefore unable to flee), did not appear to pose an imminent threat, and did not appear to be armed

(factors 2-3 and 7-8, above), no reasonable jury could find that the force applied by Officers

Klobucher and Druskin was unreasonable, especially as it was of short duration, in the context of

an arrest, and following a vehicular pursuit, which courts recognize as an inherently violent activity

(factors 1, 4-5, and 6).  *See Gannaway v. Karetas,* 438 F. App'x 61, 67 (3d Cir. 2011) (noting that

"vehicular flight from police [is] an inherently violent and dangerous activity.") (citation omitted). Accordingly, Officers Druskin and Klobucher are entitled to summary judgment on Mr. Sims' excessive force claim.

On the other hand, the video evidence alone is not dispositive as to the reasonableness of the force used by Det. Krah, NA Castagna, and Baracocci. None of these Defendants were using either a dashcam or a bodycam at the time, and the bystander video on its own does not permit the conclusion that the force used by Det. Krah, NA Castagna, and Baracocci was objectively reasonable because the bystander video is unclear and captures only a short segment of the events at issue.

The bystander video is approximately seven-minutes long. *See* ECF No. 36-9. However, the physical encounter between Mr. Sims, Det. Krah, NA Castagna, and NA Baracocci is only visible for the first 10 to 15 seconds. *See id.* Furthermore, the view is obscured by what appear to be bushes, trash cans, and the like. *See id.* During the brief time that the physical encounter is recorded on the bystander video, Det. Krah and NA Castagna can first be seen attempting to gain control over Mr. Sims, who is on the ground and out of view. *See id.* It is not clear from the bystander video whether Det. Krah and NA Castagna are striking or simply grabbing Mr. Sims at this point, *see id,* although it is undisputed that Det. Krah and NA Castagna "attempted to gain control with several strikes." ECF No. 35 ¶ 26. At approximately the 6 second mark, Mr. Sims can be seen rising to his feet, with Det. Krah and NA Castagna behind him. *See* ECF No. 36-9. Det. Krah and NA Castagna arguably appear to have partially restrained Mr. Sims at this point, with at least one of Mr. Sims' arms potentially pinned behind his back. *See id.* Two other non-uniformed officers—NA Baracocci and a non-party law enforcement officer identified in various reports as "SNA Michael Kanuch"—appear at about the 7 second mark. *See id.*; *see also, e.g.*,

ECF No. 36-8 (Use of Force Report filed by NA Baracocci, noting that "Myself and SNA Michael Kanuch arrived on scene.").  NA Baracocci moves to assist Det. Krah and NA Castagna.  *See* ECF No. 36-9.  It is not clear from the bystander video whether, as alleged by Mr. Sims, NA Baracocci then punches Mr. Sims in the face, *see* ECF No. 52 ¶¶ 12–13, or, as argued by Defendants, that NA Baracocci simply assisted Det. Krah and NA Castagna with restraining Mr. Sims, who they claim was continuing to struggle.  *See* ECF No. 35 ¶ 27.  By the 12 second mark, Mr. Sims and Det. Krah, NA Castagna, and NA Baracocci have moved down the slope and out of the camera's view.  *See* ECF No. 36-9.  Mr. Sims claims the Defendants dragged him out of view strategically to avoid being filmed, *see* ECF No. 36-1 at 38:8–12, while Defendants maintain that the group moved down the slope as a result of Mr. Sims' continued attempts to break free.  *See* ECF No. 36-4 at 2 (NA Castagna's Investigation Report).  Again, the bystander video does not clearly support either version of events.

Furthermore, even if the bystander video were clear, there is no video corroboration of any party's version of events before the bystander video begins, nor is there any video corroboration of the events that transpired during the approximately 30 seconds after Mr. Sims and Det. Krah, NA Castagna, and NA Baracocci leave the bystander video's field of view and when Officers Klobucher and Druskin arrive on the scene—at which point the uniformed officers' bodycams clearly record what happened.  *See* ECF No. 36-9.  These gaps in the video record are significant because the parties sharply dispute what happened during this time.

For example, while Mr. Sims claims that he drove to his aunt's house at or below the speed limit and that he obeyed all traffic laws, Defendants maintain that Mr. Sims "proceeded through residential areas at a high rate of speed, without stopping at stop signs or signaling, and crossing onto the opposing side of the road."  *Compare* ECF No. 35 ¶ 9 *with* ECF No. 51 ¶ 1.  Defendants

24

state that Det. Krah and NA Castagna observed Mr. Sims reach towards the passenger seat of his vehicle during the pursuit, such that "they believed Mr. Sims was attempting to grab or conceal a firearm." ECF No. 35 ¶¶ 10–11. As noted above, Mr. Sims questions whether Det. Krah and NA Castagna could have seen such movements, given the dark tint on the rear windshield of Mr. Sims' vehicle, but does not dispute that he did reach towards the passenger side of the car during the pursuit. *See* ECF No. 51 ¶¶ 2–3.

Next, although Mr. Sims concedes that, after getting out of his car, he did not obey Det. Krah's and NA Castagna's order to get on the ground, he maintains that he did not attempt to flee and instead calmly stood still or moved towards the officers with his hands raised, such that he and Det. Krah and NA Castagna "met out like in the middle of the vehicles. Like in between their car and my car at the back of it… [and] once I seen the aggression and guns drawn, they're still, like, screaming at me, I started backing up." ECF No. 36-1 at 84:11–16. Defendants, on the other hand, claim that Mr. Sims moved away from them, towards the front of his vehicle, such that they believed "Mr. Sims was possibly attempting to take a position of cover and possibly attempting to grab a weapon." *See* ECF No. 35 ¶ 20. Mr. Sims does not dispute this fact. *See* ECF No. 51. In any event, when Mr. Sims failed to comply with the command to get on the ground, NA Castagna and Det. Krah moved to seize Mr. Sims. *See* ECF No. 35 ¶ 21; *see also* ECF No. 51 ¶ 5 (disputing only that he struck at Det. Krah and NA Castagna).

With all that said, it is undisputed that (1) Mr. Sims saw that Det. Krah and NA Castagna were wearing tactical vests with "POLICE" written on them; (2) he heard them yell "Police. Get on the ground."; (3) Mr. Sims did not comply, but instead continued "to move"; (4) at some point in this sequence, Mr. Sims threw his keys onto the porch of his aunt's house; and (5) "based on Mr. Sims' movement of his body and hands [and] on [NA Castagna's] law enforcement

experience, NA Castagna believed that Mr. Sims was possibly attempting to take a position of cover and possibly attempting to grab a weapon." *See* ECF No. 35 ¶¶ 15–20.

Once the physical contact began, Mr. Sims claims that he did not resist Defendants' efforts to restrain him and that Det. Krah and NA Castagna, later joined by NA Baracocci, used excessive force in restraining him. *See, e.g.,* ECF No. 51 ¶¶ 5–11. On the other hand, Defendants maintain that Mr. Sims did resist and that the force they applied (including delivering "several strikes" in order to obtain compliance) was therefore reasonable. *See* ECF No. 35 ¶¶ 21, 26–27. Mr. Sims disputes Defendants' claims that, for example, Mr. Sims "delivered a left leg kick directly to NA Castagna's groin" and that "Mr. Sims continued to scratch, grab, shove and toss his arms to break free of control." *See* ECF No. 51 ¶¶ 6–7. On this point, the bystander video provides some support for Mr. Sims' account, in that he does not clearly appear to struggle in the few seconds he is visible, and NA Castagna does not appear to be suffering any ill-effects from a blow. *See* ECF No. 36-9. On the other hand, Mr. Sims disputes only that he *intentionally* kicked NA Castagna in the groin, explaining in his deposition that the blow to NA Castagna may have been an inadvertent result of NA Castagna tackling him. *See* ECF No. 36-1 at 41:1–3 ("I did not intentionally kick that man in his groin. My legs went into his groin when he tackled me down the hill.").

Taking Mr. Sims' version of events as true—except to the extent his account is contradicted by the video evidence—and drawing all justifiable inferences in his favor, the Court concludes that a reasonable jury could not find that the force used by Det. Krah, NA Castagna, and Baracocci was unreasonable, in light of all the circumstances and viewed from the perspective of a reasonable officer. Applying the *Graham* and *Sharrar* factors the Court finds that the first seven all point in the direction of a reasonable use of force: (1) while the initial vehicle code infraction giving rise to the attempted traffic stop—unlawful window tint—was minor, Mr. Sims escalated the situation

significantly by appearing, from the perspective of Det. Krah and NA Castagna, to commit the offense of fleeing/eluding by failing to stop, resulting in a vehicle pursuit through a residential area that went on for nearly a mile;  (2) reasonable officers could have reasonably believed that Mr. Sims posed a threat, given his movements within the vehicle;  (3) although Mr. Sims disputes that he attempted to flee after exiting his vehicle, Mr. Sims concedes that he failed to comply with commands from officers whose tactical vests clearly identified them as police to get on the ground and instead continued moving;  (4) reasonable officers in the position of Det. Krah, NA Castagna, and NA Biricocci could reasonably have believed that Mr. Sims was violent and/or dangerous, given the vehicle pursuit, *see Gannaway v. Karetas,* 438 F. App'x 61, 67 (3d Cir. 2011) (noting that "vehicular flight from police [is] an inherently violent and dangerous activity.") (citation omitted)), and the allegedly inadvertent blow to NA Castagna's groin;[8]  (5) the action, beginning from the time NA Castagna tackled Mr. Sims to the time Mr. Sims is handcuffed, appears to have been brief, lasting no more than about two minutes;[9]  (6) the action took place in the context of a lawful arrest;  and (7) reasonable officers in the position of Det. Krah and NA Castagna could reasonably have feared that Mr. Sims was armed, given Mr. Sims' movements in the car and erratic decision to throw his car keys.  Factor eight—the number of individuals the officers had to contend with—is neutral or points in Mr. Sims' favor given that Defendants outnumbered Mr. Sims two or

---

[8] While the Court does not disregard Mr. Sims' testimony that the alleged kick to NA Castagna's groin was accidental, his intent (or lack thereof) at this point of the analysis is ultimately immaterial, as the reasonableness of the use of force must be determined from the perspective of a reasonable officer under the circumstances.  That is, a reasonable officer in NA Castagna's position would have no way of knowing, at that point, that Mr. Sims had not intentionally kicked him—he would only know that he had received a blow to the groin.  *See also* ECF No. 36-8 at 2 (Use of Force Report prepared by NA Biricocci noting that after arriving on the scene "I was able to hear my partner NA Castagna say 'he just kicked me.'").

[9] The Court arrived at this approximation by comparing the bystander video with the bodycam videos, in light of Mr. Sims' testimony.  According to Mr. Sims' testimony, the bystander video picks up moments after the physical encounter begins.  *See* ECF No. 36-1 at 53:20–54:10.  On the bystander video, Officers Druskin and Klobucher can be seen arriving at about the 40 second mark.  According to the bodycam videos, about one minute elapses from the arrival of Officers Druskin and Klobucher to the time Mr. Sims is handcuffed.  Thus, the whole physical encounter appears to have lasted for no longer than about two minutes.

three to one, with no bystanders in the immediate vicinity.  The Court also notes that, although Mr. Sims appears to have sustained some injuries,[10] he conceded that, outside of obtaining a "second opinion," he did not seek or require further treatment.  ECF No. 36-1 at 49:21–50:9.  Finally, the Court finds it relevant that, although Mr. Sims testified that Det. Krah and NA Castagna initially drew their firearms, it appears that they holstered them before physically engaging Mr. Sims, and no other Defendant appears to have used a weapon in any way.  *See id.* at 24:8–10 ("I'm still requesting what's wrong, and Castagna gets close enough to me and holsters his weapon and tackles me down the hill.");  *see also Gardner v. N.J. State Police,* No. 15-08982 (RBK/AMD), 2018 U.S. Dist. LEXIS 184419 (D.N.J. Oct. 29, 2018) (noting that "officers who draw their weapons have not used 'physical force.' Instead, they made a 'show of authority.'") (citing *United States v. Waterman*, 569 F.3d 144, 146 (3d Cir. 2009)).  Accordingly, in resolving the present Motions for Summary Judgment, the Court concludes that, "from the perspective of a reasonable officer on the scene," *Mendez*, 137 S. Ct. at 1546, the force used by Det. Krah, NA Castagna, and NA Biricocchi was objectively reasonable.  Therefore, they are entitled to summary judgment on Count IV.

### 2.   Qualified Immunity

Next, even if the Court were to conclude that there is a genuine dispute of fact as to the reasonableness of the force used, Defendants would nevertheless be entitled to qualified immunity because it was not clearly established that the force they employed amounted to a constitutional violation under the circumstances they faced.

---

[10] Indeed, it is at least undisputed that Mr. Sims was evaluated by "EMS personnel on site and was then transported to Forbes Hospital for further evaluation," ECF No. 35 ¶ 34, and the bodycam and dashcam videos clearly show Mr. Sims with significant swelling and bruising to his face.  *See* ECF No. 36-7 and 36-9.

In a recent precedential opinion, the Third Circuit emphasized that, for a right to be "clearly established," it "must be so apparent that 'every reasonable official would understand that what he is doing is unlawful.'" *Hira Educ. Servs. N. Am. v. Augustine*, 991 F.3d 180, 190 (3d Cir. 2021) (quoting *James v. N.J. State Police*, 957 F.3d 165, 169 (3d Cir. 2020)). Furthermore, "the right must be defined with a 'high "degree of specificity"' before [courts] consider that right clearly established." *Id.* (quoting *D.C. v. Wesby*, 138 S.Ct. 577, 590 (2018)). Thus, "the legal principle established in a precedential case must 'clearly prohibit the offic[ial's] conduct in the particular circumstances before him.'" *Id.* at *14–15 (quoting *Wesby*, 138 S.Ct. at 581).

Here, the right at issue is the right to be free from officers using unarmed grappling and striking techniques to effectuate an arrest, after the individual has led the officers on a vehicular pursuit, at the conclusion of which the individual fails to comply with the officers' commands and at least inadvertently kicks one of the arresting officers.

The Court has not located a precedential case where police conduct under circumstances similar to those at issue here has been found to violate a clearly established right. That said, as a district court in New Jersey recently noted in determining whether a suspect had a right to be free from being hit with a baton while resisting arrest, "the two poles of the analysis are fairly clear: Police may use force, including baton strikes, to subdue a resisting suspect; they may not, however, strike a subdued, 'handcuffed suspect who is face down and not resisting arrest.'" *Lankford v. City of Clifton Police Dep't*, 546 F. Supp. 3d 296, 313 (D.N.J. 2021) (granting qualified immunity). The case here falls somewhere between these two poles.

Next, although not directly analogous, the Third Circuit's non-precedential opinion in *Santini v. Fuentes*, 739 F. App'x 718, 721 (3d Cir. 2018) is instructive. There, a witness to a fight unintentionally failed to comply with an officer's command to keep his hands visible and, after

growing frustrated with questioning from the officer, turned to walk away.  *See id.* at 719.  The officer grabbed the witness's wrist, both men fell to the ground, and a struggle ensued.  *See id.* Other nearby officers moved to assist, striking the witness with batons and using pepper spray to subdue him.  *See id.*  As soon as the witness was handcuffed, the officers' use of force ceased.  *See id.*  The altercation lasted for thirty seconds to one minute.  *See id.*  The district court found that the officers were entitled to qualified immunity because the right at issue was not clearly established.  *See id.* at 720.  The district court defined the right at issue as:

> whether Plaintiff had a right to be free from the use of force, including the use of pepper spray and strikes from nightsticks, as a non-suspect witness who walked away from an investigatory discussion, and who admitted he (1) unintentionally did not comply with an officer's request to keep his hands visible, and (2) resisted arrest.

*Id.* at 721.  The Third Circuit found that "this formulation of the question adequately contextualizes the alleged conduct as *Saucier* instructs, with consideration of specifics rather than 'broad general proposition[s],'" *id.* (quoting 533 U.S. at 201), and concluded that the right at issue was not clearly established.  *See id.*

Here, although it is disputed whether Mr. Sims resisted arrest, it is not disputed that (1) he did not stop his car when signaled to do so by Det. Krah and NA Castagna, (2) he did not comply with commands to get on the ground, (3) he at least inadvertently struck NA Castagna in the groin, and (4) the use of force stopped immediately after Mr. Sims had been placed in handcuffs.  "Even if the right to be free from police use of force in those circumstances exists, the objectionably reasonable officer might not know that.  Because qualified immunity protects officers from reasonable error, we conclude that the grant of summary judgment is appropriate."  *Santini*, 739 F. App'x at 721.

Moreover, it is beyond dispute that carrying out an arrest "necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it," and that "'[n]ot every

push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' violates the Fourth Amendment." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (quoting *Johnson v. Glick*, 481 F. 2d 1028, 1033 (2d Cir. 1973)).  As such, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Id.* at 396–96.  At most the force used in this case fell within the "hazy border between excessive and acceptable force." *Mullenix v. Luna*, 577 U.S. 7, 18 (2015) (quotation omitted).  Thus, even if there is a genuine dispute of fact as to whether the force used was reasonable, Defendants would be entitled to qualified immunity, and summary judgment will, therefore, be entered in their favor on Mr. Sims' excessive force claim.

## IV. Conclusion

For the foregoing reasons, Mr. Sims' Second Amended Complaint will be dismissed in full, and judgment entered in Defendants' favor.

DATED this 24th day of March, 2022.

BY THE COURT:

/s/ Christy Criswell Wiegand
CHRISTY CRISWELL WIEGAND
United States District Judge

cc (via ECF email notification):
All Counsel of Record

cc (via U.S. Mail):
Neal Sims
110 Angela Drive
Pittsburgh, PA 15221